## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSCAOLA DIVISION

**DAVID BEAR,**

     **Plaintiff,**

**v.**                                  **CASE NO. 3:19cv4424-MCR-HTC**

**ESCAMBIA COUNTY BOARD OF**
**COUNTY COMMISSIONERS, and**
**DOUGLAS UNDERHILL,**

     **Defendants.**

_____/

## REPORT AND RECOMMENDATION

This case was referred to the undersigned for a report and recommendation on the Defendants' pending motions to dismiss three counts alleging First Amendment violations (Counts V, VI, VII), brought pursuant to 42 U.S.C. § 1983.[1]  ECF Nos. 29, 35.  *See* Fed. R. Civ. P. 72(b).  Escambia County, Florida, caused an allegedly worm-ridden tree located on public land to be cut down.  Defendant Douglas Underhill, a member of the Escambia County Board of County Commissioners ("Board"), maintains two Facebook pages without input or assistance from the County.  Cutting down the tree caused considerable discussion among County

---

[1] Also referred for a report and recommendation was Plaintiff's motion for an expedited hearing on state law claims brought pursuant to Florida's public records law (Counts I–IV), Florida Statutes Chapter 119, ECF No. 38, which has been denied without prejudice pending determination of whether this Court has jurisdiction.

residents on Underhill's Facebook pages. *See* ECF No. 18-4 (First Amended Complaint, Ex. D, Facebook page excerpts). Plaintiff David Bear maintains that the matter became a federal case when Underhill blocked his input into the Facebook pages, thereby violating Bear's speech. Bear claims that the blocking was official county action and that his speech was blocked by Underhill in his official capacity as a County Commissioner. After fully considering the arguments and the law, it is recommended that the Court grant the Defendants' motions to dismiss Counts V, VI, and VII, and, having fully resolved all federal claims, remand the case to state court.

## Legal Standard

Federal pleading rules require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss for the failure to state a claim, Fed. R. Civ. P. 12(b)(6), the well-pled facts of the complaint are taken as true, with reasonable inferences drawn in favor of the plaintiff. *See Manhattan Comm. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1927 (2019); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court then determines whether those factual allegations are sufficient to "state a claim for relief that is plausible on its face" and sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. This two-step plausibility determination

presents "a context-specific task," requiring courts "to draw on judicial experience and common sense," mindful that bare legal conclusions are not entitled to an assumption of truth. *Iqbal*, 556 U.S. at. at 679-80.

Additionally, documents referenced in or attached to the complaint that are central to the claim and not challenged as to authenticity may be considered as part of the pleadings for purposes of Rule 12(b)(6), and such documents attached to a motion to dismiss may be considered without requiring conversion of the motion into one for summary judgment. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

## Background

The following facts, accepted as true at this stage, are alleged in the First Amended Complaint. Since 2014, Douglas Underhill has served as a Commissioner on the Escambia County Board of County Commissioners ("Board"), which is the legislative and policymaking body for the County. Escambia County is divided into five districts. One Commissioner is elected from each district, and together these members comprise the Board.

During his tenure as a Commissioner, Underhill has used two Facebook pages, which he owns, controls, and maintains: one page is maintained under the name "Commissioner Doug Underhill" and the other under the name "Douglas Underhill."

Underhill allegedly uses the pages in part to inform the public of County activities and County projects, to post comments and photographs concerning County business, and to engage in debates with citizens, but there is no allegation that either page is in fact an "official" County or Board Facebook page.[2]   Underhill has allegedly "blocked, restricted, excluded, or otherwise limited" Bear's access to both Facebook pages in response to Bear's disfavored comments or viewpoints.   Bear contends he continues to be blocked, while other citizens enjoy full access and ability to comment on the pages.

Beginning in August 2009, the Board enacted a policy stating, "Commissioners shall not discuss County business on social networking sites, including but not limited to, Facebook."   ECF NO. 18, at 2-3 (quoting the County Commissioners' Technology Policy, Aug. 20, 2009).   However, the policy expressly permitted Commissioners to post a comment regarding County business on another person's social media site using the Commissioner's own name and stated that the

---

[2] Bear also alleges that Underhill uses the pages "as a tool of governance," "to carry out his duties as a county commissioner," and to debate on "matters of public concern" or "matters of public interest."   ECF No. 18, at 3-4.   Such buzz words are conclusory and have legal implications that need not be accepted as true.   *See generally Alves v. Board of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1160 (11th Cir. 2015) (noting that the issue of whether speech is "on a matter of public concern" is a question of law); *One Wisconsin Now v. Kremer,* 354 F. Supp. 3d 940, 950–51 (W.D. Wis. 2019) (whether a social website was used as a "tool of governance" is a conclusion to be based on consideration of the "totality of the circumstances").

County would retain a copy of any such posting.  It is alleged that Underhill was familiar with this policy but disregarded it and "readily acknowledged his lack of compliance" at Commissioner meetings in May 2019.  ECF No. 18, ¶13.  On May 16, 2019, aware that individual Commissioners were disregarding the 2009 policy that prohibited discussions of County business on social media, the Board voted to drop that policy.  In the meantime, the Board had adopted a separate policy dated February 2, 2012, governing the County's official social media sites and prohibiting County employees, including Commissioners, from conducting County business on their personal social media accounts.  ECF No. 35-1.[3]  Under this policy, adopted before Underhill's 2014 election to the Board, County employees and Commissioners who wish to establish an official County page or engage in social media in an official capacity are required to obtain approval from the County Administrator and coordinate with the Public Information Office as well as the Information Technology Department.[4]

---

[3] The 2012 policy is attached to the Motion to Dismiss  Because the Board's policy is central to the First Amended Complaint and there is no authenticity objection to this policy, the Court can consider it without converting the motion into one for summary judgment.  *See Day v. Taylor*, 400 F.3d at 1276.

[4] The County policy expressly prohibits the use of any logo or official mark of the County or the Board on personal social media accounts, requires disclaimers on personal accounts, and provides that official sites shall not be used to transmit personal information.

Bear asserts that the Board knew of Underhill's alleged violations of its social media policy and his blocking of citizen speech at least since January 2019 and took no action to address the issues.  However, it is also alleged that the County Attorney warned Underhill and other Commissioners against blocking citizens from their social media sites, informing them of recent court decisions finding that elected officials' social media sites could be considered a public forum.  She also expressly reminded the Commissioners of the County's policy against conducting County business on social media.[5]   In April 2019, Bear began requesting copies of the blocked Facebook pages, asserting they are public records subject to disclosure under Florida law.

---

[5] In particular, emails attached to the First Amended Complaint show that in May 2018 and again in January 2019, County Attorney Allison Rogers advised the Commissioners by email of recent decisions in which courts were viewing elected officials' social media accounts as creating a public forum. ECF 18-1, 18-2.  She cautioned the Commissioners not to block a citizen from posting, viewing, or commenting on the account because of the viewpoint expressed and reminded them  of the County policy forbidding Commissioners from conduct County business on a social media site.  ECF No. 18-1, -2.  She specifically referenced *Knight First Amendment Institute at Columbia Univ. v., Trump*, 928 F.3d 226 (2d Cir. 2019) (holding the President created a public forum on his Twitter account), and *Jordan v. Bell*, Case No. 4:17cv473-RH/CAS (N.D. Fla. Aug. 28, 2018) (finding Clerk of Court liable for viewpoint discrimination in her official and individual capacities for striking an unfavorable post on the clerk's office official Facebook page), ECF No. 18-6 (attached to the First Amended Complaint).

Bear filed suit, and the Board removed it to this Court.[6]  Bear claims in Counts

I through IV of the First Amended Complaint that Underhill and the Board failed or

refused to provide complete responses to his requests for public records, as required

by Florida law.  In Counts V, VI, and VII, Bear asserts that the Board, and Underhill

in his individual and official capacities, violated his First Amendment free speech

rights when Underhill blocked Bear's comments on the basis of his viewpoint.  Bear

seeks injunctive relief, compensatory and punitive damages, as well as costs and

attorneys' fees.[7]  *See* 42 U.S.C. §§ 1983, 1988.

**Discussion**

To state a claim under § 1983, a plaintiff must plausibly allege (1) the

deprivation of a constitutional right and (2) "that the alleged deprivation was

committed under color of state law."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S.

40, 49 (1999).  The constitutional right allegedly infringed is free speech.  The First

Amendment, applicable to the states through the Fourteenth Amendment, provides

that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const.

amends. I, XIV.  As recently reiterated by the Supreme Court, "[t]he Free Speech

---

[6] The case was timely removed to federal court based on federal question jurisdiction.  *See* 28 U.S.C. § 1331.

[7] In response to the Board's Motion to Dismiss, Bear acknowledged that punitive damages are not appropriate against the Board.

CASE NO. 3:19cv4424-MCR-HTC

Clause of the First Amendment constrains government actors and protects private actors;" therefore, the First Amendment "does not prohibit *private* abridgement of speech." *Halleck*, 139 S. Ct. at 1926, 1928.  The under-color-of-state-law element of § 1983, similar to the Fourteenth Amendment's state-action requirement, "excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)); *see also Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) ("Private conduct is not actionable under § 1983; rather, to state a claim for relief, the alleged deprivation of a constitutional right must occur 'under color of state law.'").  The Board and Underhill argue that Counts V, VI, and VII should be dismissed for the lack of action taken under color of state law.  *Twombly*, 550 U.S. at 555.

>    1.   <u>The Board and Official Capacity Claims</u>

A municipality or county may be liable under § 1983 only if the execution of its policies can be said to have violated an individual's constitutional rights.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  A municipality is not responsible under § 1983 for the acts of its employees on a theory of *respondeat superior*.  *Id.* at 691.  Instead, municipal liability is limited to actions attributed to the municipality by reason of (1) an official policy, (2) a widespread

pattern or practice so pervasive that it assumes the force of law, or (3) the actions of an official with final policymaking authority such that the actions can be deemed to represent government policy.[8]  *See Denno v. Sch. Bd. of Volusia Cty., Fla*., 218 F.3d 1267, 1276 (11th Cir. 2000) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).   Custom is shown by "a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'"  *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (other internal marks omitted).  In addition, an alleged policy or unofficial custom must be "the 'moving force behind the constitutional deprivation.'"  *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) (plurality)).   "Thus, not only must there be some degree of 'fault' on the part of the municipality in establishing or tolerating the custom or policy, but there also must exist a causal link between the custom or policy and the deprivation."  *Id.*

---

[8] Also, "a suit against a government official in his official capacity is deemed a suit against the entity that he represents."  *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).

The Board argues that the facts alleged do not present a plausible claim that Bear's First Amendment rights were violated by a County policy, a widespread tacitly authorized custom, or an act of a county official that could be considered county policy.  The undersigned agrees.  Despite a conclusory allegation that "Underhill operates both Facebook pages pursuant to [Board] policy, custom, or practice," ECF No. 18 at ¶ 110, the only policy quoted in the complaint is the 2009 policy that *forbids* Commissioners to discuss County business on social media. There is no alleged policy requiring a Commissioner to establish an official Facebook page in order to fulfill his duties on the Board, and although the 2009 policy was formally abandoned in May 2019, the newer 2012 policy similarly prohibits County employees and Commissioners from conducting County business on their personal social media accounts.[9]  The 2012 policy regulates use of the County's official sites, stating Commissioners, employees, and individual

---

[9]   The Supreme Court has recognized that cyberspace and social media have become important places for the exchange of views and that governments may establish accounts for official communication:

> On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos. On LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship. And on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner.  Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose.

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

CASE NO. 3:19cv4424-MCR-HTC

departments may not add content to an official County social media site, establish an official page, or engage in social media in an official capacity without first obtaining approval from the County Administrator. There is no allegation that Underhill requested or obtained approval to engage in social media in an official capacity or that his Facebook pages are in fact "official" County pages.[10]  To the contrary, it is alleged that Underhill owns, controls and operates them.  Thus, there simply is no plausible claim that the Board or any official policy played a role in establishing or sanctioning Underhill's Facebook pages or that the Board had any hand in Underhill's decision to allow or block citizen speech on his Facebook pages.

Bear argues that the Board nonetheless can be liable based on a custom of inaction, by failing to enforce its social media policy while aware that Underhill was blocking citizen speech on his Facebook page.  Even assuming as true that the Board took no action to sanction Underhill for discussing County business under the 2009 policy, which was abandoned in May 2019, the County had no control over Underhill's actions on his personal Facebook pages, and they did not become a County-sanctioned public forum by inaction.  "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally

---

[10] The policy defines "Official" as a social media account or site established by the County, and this requires approval of the County Administrator.  ECF No. 35-1.

opening a nontraditional forum for public discourse."[11]  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 802 (1985); *see also Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc*., 942 F.3d 1215, 1237 (11th Cir. 2019) (noting a school board did not create a public forum "by inaction") (quoting *Cornelius,* 473 U.S. at 802); *German v. Eudaly*, No. 3:17cv2028-MO, 2018 WL 3212020, at *6 (social media posts about events that occurred while a commissioner was working did not transform the non-official page into a page operated under color of law, and the alleged public forum created on the Facebook page was not operated by the county).  Thus, no plausible County custom arises from the Board's inaction that can be said to have affirmatively created a public forum or unconstitutionally restrained speech.[12]

---

[11]   Courts use "'forum analysis' to evaluate government restrictions on purely private speech that occurs on government property."  *Walker v. Tex. Div., Sons of Confederate Veterans, Inc*., — U.S. ——, 135 S. Ct. 2239, 2250 (2015) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 800 (1985)). The Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum."  *Cornelius*, 473 U.S. at 802.  The Court has also explained that "[n]ot every instrumentality used for communication, however, is a traditional public forum or a public forum by designation."  *Id.*  Also, "a nonpublic forum is a government space that is not by tradition or designation a forum for public communication."  *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc*., 942 F.3d 1215, 1237 (11th Cir. 2019) (internal marks omitted).  Viewpoint discrimination—which occurs when a government official's decision to take a challenged action was "impermissibly motivated by a desire to suppress a particular point of view"—is prohibited in all forums.  *See Cornelius*, 473 U.S. at 812–13.  These cases, however, are premised on government action in either creating or regulating the forum, which is absent on the facts alleged.

[12]   Bear relies on *Smart v. City of Miami*, 740 F. App'x 952, 964 (11th Cir. 2018), and *Brown* to argue custom or practice is a question of fact that must be determined on a fully

Bear also argues that the Board ratified Underhill's actions by its decision to drop the 2009 policy forbidding discussions of County business on social media. This argument similarly lacks merit.  Ratification does not occur by inaction.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (ratification applies only where a superior affirmatively approves and adopts a subordinate's action and the rationale for that action); *see also Matthews v. Columbia Cty*., 294 F.3d 1294, 1297 (11th Cir. 2002) ("The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it."). The 2012 policy continues to prohibit conducting County business on social media and requires County Administrator approval to establish an official page, which Underhill did not seek. Thus, it cannot be said that dropping the 2009 policy in any way ratified Underhill's actions on his private Facebook pages.  Moreover, even assuming the Board

---

developed record.  On the facts alleged, the undersigned is unpersuaded.  The question in *Smart* was whether a city custom was created by an alleged systemic failure to require a film crew to obtain the consent of individuals or property owners before filming a reality show at a crime scene during a police search or interview.  Thus, contrary to this case, a constitutional deprivation was clearly alleged in *Smart* under the Fourth Amendment, implicating individual privacy rights. Similarly in *Brown*, 923 F.2d at 1481, the Eleventh Circuit found a custom sufficiently pled where race discrimination was adequately alleged.  Here, by contrast, the facts alleged do not raise a plausible First Amendment violation because there is no allegation that the County acted to create a public forum or had any power to control the forum, the speech, or Underhill's actions.  There must be "some degree of 'fault' on the part of the municipality in establishing or tolerating the custom or policy" to find the municipal liable under § 1983.  *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985).

CASE NO. 3:19cv4424-MCR-HTC

possessed the power to sanction Underhill for blocking speech on his personal Facebook pages, "failing to do so was not the same as approving and adopting [Underhill's] action." *Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 715 (E.D. Va. 2017), *aff'd sub. nom Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), as amended (Jan. 9, 2019); *see also Ashby v. Isle of Wight Cty. Sch. Bd*., 354 F. Supp. 2d 616, 627 (E.D. Va. 2004) (stating a failure to act was not the same as ratifying or approving an action).

Bear's reliance on recent cases to support his assertion that an individual County Board member's action can be considered state action is misplaced.  In *Knight First Amendment Institute at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (holding the President of the United States created a public forum on his Twitter account), it was clear that the President, as the sole chief executive, was the final policymaker, whereas Underhill is not.  Also, in *Jordan v. Bell*, an official social media site established by the Clerk of Court was at issue.  Case No. 4:17cv473-RH/CAS (N.D. Fla. Aug. 28, 2018) (finding Clerk of Court liable for viewpoint discrimination in her official and individual capacities for striking an unfavorable post from the "clerk's office Facebook page").  Here, by contrast, Underhill does not act unilaterally for the Board, and, as discussed above, despite a conclusory allegation that he "operates" the pages pursuant to the Board's policy or

custom, the Board has a policy for establishing "official" pages, and there is no factual allegation that Underhill established an "official" County page pursuant to it.

To the extent Bear relies on *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), as support for his claim against the Board, he has mischaracterized its holding.  In *Davison*, the Fourth Circuit affirmed the dismissal of the claim against a county board, finding no official county policy played a role in the decision to ban a citizen from the "Chair" Facebook page.  *Id.* at 676. 689.  The court also concluded, albeit on a summary judgment record, that the official capacity claim failed because the Chair did not act as a municipal policymaker by her "one-off, unilateral decision to ban" a citizen's speech, in which the board did not acquiesce.  *Id.* at 690.  *Davison* thus supports a conclusion here that the allegations are insufficient to raise an inference that any County policy played a role in Underhill's decision to ban speech or that Underhill was a final policymaker.  Therefore, the allegations fail to state a claim against the Board in Count VI or an official capacity claim in Count V.

> 2.    Individual Capacity Claim

Bear argues that Underhill is liable under § 1983 in his individual capacity (Count VII) for creating a public forum on his Facebook pages and banning or blocking Bear's speech, while acting under color of state law.  Underhill moves to

dismiss, arguing that the allegations do not plausibly assert he was acting under color of state law.

A person acts under of color of state law in exercising "power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotations omitted). "[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law," but he also can be said to have acted under color of state law when abusing or misusing the position given to him by the state or local government. *Id.* at 49-50; *Williams v. United States*, 341 U.S. 97, 99 (1951). State action also can be found "if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself," *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001), and thus, depending on the circumstances, a private party may be properly characterized as a state actor, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). "[I]t is not enough that the function [being exercised] serves the public good or the public interest in some way. Rather, to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function." *Halleck*, 139 S.

Ct. at 1928-29.  The crucial question for individual liability is "whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual."  *Myers v. Bowman*, 713 F.3d 1319, 1330 (11th Cir. 2013) (finding a county magistrate judge acted as a private individual in reporting a theft, though using his government-issued communications system to report it).

Underhill argues that as an elected County Commissioner, he is not an "officer" under Florida's Constitution, Art. VIII, § 1(d) (defining County officers as "a sheriff, a tax collector, a property appraiser, a supervisor of elections, and a clerk of the circuit court"), and thus is not clothed with authority under state law to take any action individually.  He contends that because state law has given him only the authority to act as part of the collective legislative body of the Board,[13] he could not be said to have acted under color of state law in establishing or maintaining his own Facebook pages.  On the facts alleged, the undersigned agrees.  Establishing a private Facebook page using only his elected title of Commissioner Doug Underhill and controlling the access to it—not conducting county business, not using any county employees or resources, not clothing the site as an "official" government site—

---

[13] Florida's Constitution, Article VIII, § 1(e), defines "Commissioners" as:  "Except when otherwise provided by county charter, the governing body of each county shall be a board of county commissioners composed of five or seven members serving staggered terms of four years."

cannot be said to be the exercise a "power[] traditionally exclusively reserved to the State." *Halleck*, 139 S. Ct. at 1928-30 (stating in a motion to dismiss context that "a private entity may qualify as a state actor when it exercises powers traditionally exclusively reserved to the State" and that "operating a public access channel on a cable system is not traditional, exclusive public function"). The conclusory allegations in the First Amended Complaint that Underhill created a public forum and used his private Facebook pages as a "tool of governance" are insufficient to plausibly allege state action. No facts alleged show County business was being conducted on the pages or that Underhill used County resources or employees to create, control or maintain his Facebook pages. There is no allegation that he used any official County logo or mark on the pages, aside from his title, and no allegation that state or county law requires a County Commissioner to use social media to communicate with citizens as part of his duties. Moreover, the County has official social media sites for official communications, and this suit does not allege misuse of an official social media site.

Bear relies on recent cases finding that an elected official's social media site can trigger First Amendment scrutiny. *See, e.g., Knight First Amendment Inst*., 928 F.3d at 230-36 (2d Cir.); *Davison*, 912 F.3d at 673-74 (4th Cir.); *Jordan,* Case No. 4:17cv473-RH/CAS (N.D. Fla.). Those cases, which are not binding, are not on all

CASE NO. 3:19cv4424-MCR-HTC

fours with this case. As noted earlier, the Second Circuit's case of *Knight First Amendment Inst.*, is distinguishable because it involved official state action by the act of the President conducting official business on a social media site,[14] *see* 928 F.3d at 230-36, and similarly, the *Jordan* case from this District involved the act of a Clerk of Court banning speech from an *official* site, the Clerk's Office Facebook page. By contrast, Underhill's private Facebook pages are at issue here, not a County page, and Underhill, unlike a chief executive or agency head, is not a final policymaker.

The Fourth Circuit's *Davison* case is factually closer to the instant case, but it presented more compelling circumstances than alleged here to support its conclusion that a nexus to state action was plausible. In *Davison,* the Loudoun County Chair of the board used her title to name the page, as here, but she additionally addressed all of her posts to "Loudoun" (the county); designated the page as belonging to a "government official;" labeled it as "her county Facebook page;" administered it together with her chief of staff, a county employee; provided her official county

---

[14] The Second Circuit acknowledged that "not every social media account operated by a public official is a government account." *Knight First Amendment Inst.*, 928 F.3d at 236. The court noted in *dicta* that whether First Amendment concerns are triggered by a non-official account will depend on "how the official describes and uses the account; to whom features of the account are made available; and how others, including government officials and agencies, regard and treat the account." *Id.* These are fact specific inquiries, but, for reasons discussed above, the facts alleged are insufficient to show state action triggering First Amendment concerns.

email and office number on the page; and used it for county business, such as coordinating the county's response to a large snow storm, inviting participation in public meetings, and inviting applications to serve on a public commission.[15] *Davison*, 912 F.3d at 673-74.   The conclusory allegations that Underhill was "conducting" County business on the page or using it to "carry out his duties" are insufficient because the *facts* alleged show only that he was discussing County projects with others, for which no official title is necessary.[16]

---

[15] *Davison* found state action from seemingly private conduct based on the totality of the circumstances, and relying on *Rossignol v. Voorhaar*, 316 F.3d 516, 524 (4th Cir. 2003) (finding state action where "the sole intention" of the official taking an action is "to suppress speech critical of his conduct of official duties or fitness for public office").   But *Rossignol* is also factually distinguishable from this case.   There, a sheriff had approved of a plan to suppress critical speech about his official role by having his off-duty deputies purchase all copies of an election day news publication; importantly, the sheriff participated in the plan, and "their official positions were an intimidating asset in the execution of their plan." *Id.* at 519.   Those circumstances are far removed from the Facebook discussions of one county commissioner on his own social media pages at issue here.

[16] The undersigned acknowledges that several other courts around the country have also concluded that an elected official's acts of establishing a social media site with an interactive public component and blocking disfavored or critical citizen speech states an individual capacity claim.   *See e.g., One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wisc. 2019) (finding on summary judgment record that a state representative's creation of a Twitter account was state action based on several factors); *Windom v. Harshbarger*, 396 F. Supp. 3d 675 (N.D. W.Va. 2019) (stating, "Private property—such as a Facebook page—can constitute a public forum based on its purpose and use," and finding allegations of fact sufficient to state a claim, though not as compelling as the facts in *Davison*); *Woolsey v. Ojeda*, 363 F. Supp. 3d 688 (S.D. W.Va. 2019) (denying a motion to dismiss and finding state senator's Facebook page had a sufficiently close nexus to be attributable to the state for purposes of an individual capacity claim); *Garnier v. Poway Unified Sch. Dist.*, 2019 WL 4736208 (S.D. Cal. 2019) (dismissing damages claim on qualified immunity but finding questions of fact regarding claim for injunctive relief).   These cases are not binding and while, as here, they involved use of the elected officials' titles, they all included factors not present here.

Also, to the extent the *Davison* case can be said to support Bear's argument, the undersigned disagrees with its reasoning, which relied in part on *Halleck v. Manhattan Comm. Access Corp.*, 882 F.3d 300, 306–07 (2d Cir. 2018) (holding public access television channels operated by a private company created a public forum), *overruled* 139 S. Ct. 1921 (2019).  In overruling that decision, the Supreme Court stressed the importance of government action in creating a public forum.  *See Halleck*, 139 S. Ct. at 1930 ("When the government provides a forum for speech (known as a public forum), the government may be constrained by the First Amendment," but "when a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor" and "may thus exercise editorial discretion").  In the wake of the Supreme Court's decision, one respected treatise criticized the conclusion of *Davison* as "seriously undermine[d]" by *Halleck* because *Davison* ignored the fact that state action is required to create a public forum.  *See* 1 Smolla & Nimmer on Freedom of Speech § 8:33:25 (update Oct. 2019) (stating, "it would send First Amendment doctrine into uncharted territory to begin treating the private social media platforms of public officials as public forums").

In the absence of controlling law otherwise, Underhill's conduct of merely engaging in social media discussions about County projects while using his title,

CASE NO. 3:19cv4424-MCR-HTC

without more, is insufficient to allege the exercise of, or a sufficiently close nexus to, any "power 'possessed by virtue of state law and made possible only because he was clothed with the authority of state law.'"[17]  *Myers*, 713 F.3d at 1329 (quoting *West*, 487 U.S. at 49); *see also* 1 Smolla & Nimmer on Freedom of Speech § 8:33:25 (stating "personal social media accounts of users, even users who are public officeholders, [are not] public forums"—they are "private venues, not government owned and operated forums").  As a result, Underhill's act of blocking or restricting access to the private Facebook pages, however discriminatory, does not allege action taken under color of state law.[18]

Therefore, it is recommended that Count VII be dismissed for failure to state a claim.  Plaintiff's request for leave to amend would be futile.  He has already had an opportunity to amend the complaint and any new allegations could not cure the fact that Underhill owns, operates, and maintains his Facebook pages individually, not under the Board's authorization.  Because all claims over which the Court has

---

[17] Whether the Facebook page qualifies as a public record for purposes of state law is a different matter on which no opinion is stated here.

[18] Even if the allegations were sufficient, there is no clearly established law in the Eleventh Circuit or from the Supreme Court that an elected official's private Facebook page is a government-created or public forum or that the official's individual act of blocking speech, without any other factor indicating official action, executive control, or involvement of county resources, is taken "under color of state law."  *See generally, Davison v. Rose*, 2017 WL 3251293 (E.D. Va. 2017) (dismissing on grounds of qualified immunity).

original jurisdiction have been dismissed, the undersigned recommends that the Court decline to exercise supplemental jurisdiction and remand the case to state court. *See* 28 U.S.C. § 1367(c).

Accordingly, it is recommended that the Court **GRANT** the motions to dismiss, ECF Nos. 29, 35; **DISMISS** Counts V, VI, and VII for failure to state a claim; **REMAND** the remaining claims to state court; and close the file.

**DONE AND ORDERED** this 23rd day of March 2020.

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**