UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DAVID BEAR,

     Plaintiff,

v.                              Case No. 3:19cv4424-MCR-HTC

ESCAMBIA COUNTY BOARD OF
COUNTY COMMISSIONERS and
DOUGLAS B UNDERHILL,

     Defendants.

_____/

## ORDER ON MOTION TO COMPEL

This matter is before the Court on Plaintiff's Renewed Motion for Expedited Hearing to Compel Defendants' Responses to Plaintiff's Public Records Requests (ECF Doc. 74). Upon consideration of the evidence presented at the evidentiary hearing, the parties' written submissions (ECF Docs. 83, 84, 85, 87, 88, 89, 90), and after conducting an *in camera* review of over 24,000 pages of downloaded messages and posts from Facebook, the undersigned finds the motion should be GRANTED as set forth below.[1]

---

[1] As this matter is before the undersigned on a motion to compel and was referred to the undersigned for disposition, the undersigned has issued her opinion in the form of an order rather than a report and recommendation. *See* 28 U.S.C. § 636(1)(a).

## I.    BACKGROUND

Plaintiff, David Bear ("Bear"), submitted three (3) public records request (pursuant to Florida's Public Records Act, Fla. Stat. § 119.01 *et seq*.), to Defendants Douglas Underhill ("Underhill") and the Escambia County Board of County Commissioners ("ECBCC"), seeking the production or inspection of messages and posts on various Facebook pages on a Facebook account owned or controlled by Underhill.  Defendants produced over 36,000 pages of documents to Bear in response to the requests.  Bear contends, however, the production is both untimely and insufficient.  At the crux of the motion pending before the undersigned is whether approximately 24,000 pages of Facebook messages and posts from the "Commissioner Doug Underhill" Facebook page and the "Doug Underhill" Facebook page are public records under Chapter 119 of the Florida Statutes and, thus, subject to inspection and production.[2]

Under Florida Statute 119.11, when an action is filed to enforce the provisions of Chapter 119, the court in which the action is filed "shall set an immediate

---

[2] Plaintiff filed a seven-count First Amended Complaint against Defendants.  Counts I–IV of Plaintiff's complaint allege Defendants violated Chapter 119 of the Florida Statutes for failing to properly respond to Plaintiff's public records request.  ECF Doc. 18.  Counts V–VII allege that Defendants violated Plaintiff's First Amendment constitutional rights by preventing Plaintiff from seeing or accessing certain Facebook pages. *Id.* at 20-37.  The undersigned is not addressing any of those claims and this order is not necessarily dispositive of whether Defendants unlawfully failed to produce public records as necessary for a determination that Defendants violated the Public Records Act. *See State Attorney's Office of Seventeenth Judicial District v. .Cable News Network, Inc.*, 254 So. 3d 461, 463 (Fla. Dist. Ct. App. 2018) ("School Board's conduct [in withholding documents] did not become 'unlawful' because it pursued this unsettled area of law on appeal").

hearing," to determine whether records should be produced. Fla. Stat. § 119.11. On February 1, 2021, after affording the parties an opportunity to brief their positions, the undersigned held an all-day evidentiary hearing. Attending the hearing were attorneys J.J. Talbot and Erik Figlio, representing Bear, who was also in attendance; attorney Joe Hammons, representing the ECBCC and Commissioner Underhill in his official capacity, and Charles Peppler, as representative for the ECBCC; and attorneys Ed Fleming and Matthew Bush, representing Underhill, in his individual capacity, who was also in attendance.

The following witnesses testified at the hearing: Plaintiff David Bear; Mary Grace Rahm, an attorney at Clark Partington who was hired by the ECBCC to retrieve information from the Underhill Facebook pages; County Attorney Alison Rogers; Kristin Hual, an associate attorney for the County; and Defendant Commissioner Underhill.

## II.    Plaintiff's Requests and Defendants' Responses

Bear sent the first request to County Attorney Rogers via text message, in April 2019, seeking all documents from Commissioner Underhill related to the County's social media policy and communications from Rogers to individual commissioners

regarding the social media policy.[3]  Although Defendants produced some documents in response to the request, Bear claims the production is incomplete.

Bear submitted the second request via the Commissioner Doug Underhill Facebook page on June 3, seeking all Facebook messages between March 1, 2019, and June 3, 2019, mentioning Bear or his family.  Bear did not communicate this request to ECBCC until August, when his counsel sent a letter to Commissioner Underhill and ECBCC.[4]  The ECBCC did not produce any documents in response to this request.  Commissioner Underhill responded with some documents two (2) months later.  Bear contends the production is incomplete.

Bear submitted the third request via email to Underhill in August 2019, seeking a complete history of all posts made to the Douglas Underhill Facebook account. Bear subsequently amended the request to limit it to a history of all posts related to Underhill's public duties, activities, and work as a county commissioner.

In March 2020, the ECBCC paid Clark Partington approximately $7,700 to download information from the Commissioner Underhill Facebook page and Underhill's personal Facebook pages.  Rahm was the attorney assigned to the project

---

[3] The County adopted a Technology Policy on August 20, 2009, which prohibited commissioners from discussing county business on social networking sites but allowed for commissioners to post a story or comment on social media under the commissioner's actual name as long as no other commissioner had also posted a comment or response to the same article or issue.  The Policy also required the County to retain a copy of the post.  The Policy was dropped by the ECBCC on or about May 16, 2019.

[4] The request was not limited to County matters, sent in Underhill's capacity as a commissioner, or related to Underhill's duties as a commissioner.  Thus, the request is not one for public records.

and, at the request of Bear's technology expert, used Facebook Direct to download the information. Once Clark Partington completed the download, which consisted of approximately nine (9) gigabytes, the information was sent to Pro Legal to convert into printed documents and for bates labeling. Clark Partington did not review the downloaded information.

In June 2020, Underhill produced to Bear a flash drive with several thousand pages of documents; however, based on the bates numbers, approximately 24,000 pages had been removed. Defendants argue the removed pages are not public records.

## III.   THE FLORIDA PUBLIC RECORDS LAW

The people's right to public records is derived from Article I, Section 24(a) of the Florida Constitution, which provides:

> Every person has the right to inspect or copy any public record made or received in connection with the official business of any public body, officer, or employee of the state, or persons acting on their behalf, except with respect to records exempted pursuant to this section or specifically made confidential by this Constitution.

That constitutional provision is implemented through Chapter 119 of the Florida Statutes, known as the Florida Public Records Act. *See* Fla. Stat. § 119.01 ("It is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person. Providing access to public records is a duty of each agency.")

Section 119.011 defines "public records" as "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, data processing software, or other material regardless of the physical form, characteristics, or means of transmission, made or received pursuant to law or ordinance in connections with the transaction of official business by any agency."  Fla. Stat. Ann. § 119.011(12).

In *Shevin v. Byron, Harless, Schaffer, Reid and Assocs., Inc.*, 379 So. 2d 633 (Fla. 1980), the Florida Supreme Court added context to that definition and held that "a public record, for purposes of section 119.011(1), is any material prepared in connection with official agency business which is intended to perpetuate, communicate, or formalize knowledge of some type."  *Shevin*, 379 So. 2d at 640. The court explained that this was in contrast to "materials prepared as drafts or notes, which constitute mere precursors of governmental 'records' and are not, in themselves, intended as final evidence of the knowledge to be recorded."[5]  *Id.*

The parties do not disagree it is the content rather than the medium in which a record is created or transmitted that determines whether it is a public record.  The parties, however, disagree as to what constitutes "official agency business."

---

[5] The documents at issue in *Shevin* were papers belonging to an independent consulting firm hired to conduct a nationwide search for applicants for the position of managing director for the Jacksonville Electric Authority.  After examining the documents at issue, the court concluded that "letters, memoranda, resumes, and travel vouchers" were public records, but that the consultant's handwritten notes "are merely preliminary materials to aid the consultant when he later formalized knowledge gained during the interview."  *Id.* at 641.

Defendants argue Underhill's posts and communications on Facebook, even those sent to a constituent or relating to matters that may involve the ECBCC or come before the ECBCC, are not the "official business" of the "agency" because the ECBCC did not specifically authorize Underhill to create the record or speak on its behalf.

Specifically, the ECBCC argues in its post-hearing brief that because individual commissioners "do not have the authority to act on behalf of the ECBCC without a grant of authority by the collective body of the ECBCC," only those posts which were "prepared, owned, used, or retained' within the scope of Douglas Underhill's authority as an 'agent' of the ECBCC" are public records.  ECF Doc. 89 at 3.  Thus, the ECBCC posits that the test is "whether the posts at issue were made or received by Underhill in an agency capacity furthering the interests of the ECBCC" as opposed to "posts related to Underhill's communications and opinions regarding matters of public importance."  *Id.* at 4.  According to the ECBCC, as long as Underhill is "acting on behalf of and furthering the interests of the ECBCC," then the post is a public record.  *Id.*

Similarly, Underhill argues that because the posts at issue were maintained "by an individual Commissioner without direction, or authorization, of the agency" and, in fact, in contravention of "the agency's rule [forbidding] Commissioners from communicating with constituents on Facebook," they are not public records.  ECF

Doc. 90 at 3, 6. Underhill argues the Facebook communications at issue "were, at the very most, precursors to potential action by the agency by a Commissioner who clearly had no authority to act on behalf of the agency, or to speak on behalf of the agency, for a single view expressed on Facebook." ECF Doc. 90 at 19.

Bear, on the other hand, argues any social post or message sent or received by Underhill that has anything to do with County business or that falls under a duty of a commissioner constitutes a public record, regardless of whether it was posted on Underhill's personal Facebook page or the Commissioner Underhill page. This, according to Bear, includes Underhill's opinions on matters to be decided by the ECBCC, involving County business, or involving any of a number of committees Underhill serves on in his capacity as a commissioner. Bear also argues any posts related to Underhill's 2018 run for commissioner is a public record because Underhill was a commissioner at the time, but agrees posts related to his 2014 run for commissioner are not public records.

Section 119.011(2) defines "agency" as "any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law . . . and any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency." Fla. Stat. Ann. § 119.011(2). In *Shevin*, the court stated, "[A] business entity is 'acting on behalf of' a public agency if the services contracted for

are an integral part of the agency's chosen process for making a decision on the question at hand." *Shevin*, 379 So. 2d at 635.

Based on *Shevin* and the definition of "agency," the Court finds that commissioners, such as Underhill, are persons acting on behalf of the ECBCC when they are communicating with constituents on County matters involving the ECBCC or to be voted on by the commissioners. It cannot be credibly disputed that commissioners are an integral part of the ECBCC's decision making process. Thus, a commissioner can create a public record regardless of whether the ECBCC specifically authorizes the record to be created. *See Op. Att'y Gen. Fla. 2007-14*, 2007 WL 788160 (Feb. 27, 2007) (opining that an email sent by a city commissioner in connection to a transaction with official business that is intended to communicate, perpetuate, or formalize knowledge of some type is a public record even though the email contains undisclosed or blind recipients).

In *O'Boyle v. Town of Gulf Stream*, 257 So. 3d 1036 (Fla. Dist. Ct. App. 2018), the court held that "an elected official's use of a private cell phone to conduct public business via text messaging can create an electronic written public record subject to disclosure" if the official or employee "prepared, owned, used, or retained it within the scope of his or her employment or agency." *Id.* at 1040–41. According to the court, an official or employee's communication falls "within the scope of

employment or agency" when the "job requires it, the employer or principal directs it, or it furthers the employer or principal's interests." *Id.*

Underhill does not dispute it is part of the scope of his duties as a commissioner to communicate with constituents and provide them with information about matters involving the ECBCC. This includes matters which he may be voting on, which will be presented to the ECBCC, or which have already been voted on. Underhill does not shy away from the fact that he communicates with constituents regarding County business on his Facebook account and believes he has a right to do so. Thus, while Underhill attempts to distinguish *O'Boyle* because the public official there was a mayor and not a commissioner, the distinction is one without a difference.

Of particular note and relevance to the issues here is Attorney General Opinion 2008-07. In that opinion, the Attorney General addressed several issues concerning communications with and among commissioners on privately maintained websites, including whether such communications are a public record. After quoting Chapter 119's definition of "agency," the Attorney General concluded that "a city council member clearly is subject to the provisions of Chapter 119, Florida Statutes, when making or receiving public records in carrying out official business." *Op. Att'y Gen. Fla. 2008-07* (Feb. 26, 2008). The Attorney General went on to state**:**

> **To the extent that the council member is publicly posting comments relating to city business, this office cannot conclude that such postings are not made in connection with the transaction of official business.** Accordingly, I am of the opinion that such postings would

be subject to the requirements of the Public Records Law.   When considering with the discussion above, it would appear that **the postings and emails of a city council member relating to his public duties would be public records subject to the provisions of Chapter 119, Florida Statutes**.[6]

*Id.*

While Attorney General Opinions are not binding on the courts, the Florida Supreme Court has held that such opinions are "entitled to careful consideration and generally should be regarded as highly persuasive."   *State v. Family Bank of Hallendale*, 623 So. 2d 474, 478 (Fla. 1993).   Thus, post or message on Underhill's Facebook account may constitute a public record if it was created, received, or retained by Underhill in the scope of his duties as a commissioner, relates to a County matter or to Underhill's official duties, and was intended to convey information or knowledge.   This is true regardless of whether the ECBCC specifically authorized Underhill to make such a post or comment.

To conclude otherwise would contravene the very purpose of the Public Records Act by diminishing the transparency expected for those holding public office in carrying out their official duties.

---

[6] The Attorney General goes on to find that the council member who creates the public documents through the posted comments and emails is responsible for ensuring that the information is maintained in accordance with the Public Records Law and the policies and retention schedule adopted by the city, rather than the city because the city has no ownership, control, or affiliate with the website.  *See* Fla. Stat. 119.07(1)(a) ("Every person who has custody of a public record shall permit the record to be inspected and copied . . . .").

Of course, not every social media post or message received, sent, or retained by Underhill that simply references or mentions something related to the County is a public record.  As the court in *O'Boyle* noted, "employees do not generally act within the scope of employment when they text their spouse about working late or discuss their job on social media."  *O'Boyle*, 257 So. 3d at 1041.  Similarly, in *Butler v. City of Hallendale Beach*, 68 So. 3d 278 (Fla. Dist. Ct. App. 2011), the court held that an email sent by the mayor distributing copies of an article she wrote as a contributor to the South Florida Sun Times is not an email "made pursuant to law or in connection with the transaction of official business by the City, or [] in her capacity as Mayor," even though it included as attachments transcripts of a State of the City Address and an article about tax questions raised at a commission meeting.  *Butler*, 68 So. 3d at 281.

Because, as the Florida Supreme Court recognized, "it is impossible to lay down a definition of general application that identifies all items subject to disclosure under the act," "the classification of items which fall midway on the spectrum of clearly public records on the one end and clearly not public records on the other will have to be determined on a case-by-case basis." *Shevin*, 379 So. 2d at 640.  In making that determination, however, the Court is guided by the principle that the Public Records Act "must be liberally construed in favor of access."  *O'Boyle*, 257 So. 2d at 1040.

## IV.    The Court's *In Camera* Inspection

The parties agree the proper procedure for determining whether a record is a public record is for the Court to conduct an *in camera inspection*.  *See, e.g.*, *Shevin*, 379 So. 2d at 640 (concluding documents were public records after examination of papers sealed by circuit judge); *O'Boyle*, 257 So. 3d at 1042; *Times Pub'g Co. v. City of Clearwater*, 830 So.2d 844, 848 (Fla. Dist. Ct. App. 2002), *approved sub nom. State v. City of Clearwater*, 863 So. 2d 149 (Fla. 2003) (affirming dismissal without prejudice to Times seeking an *in camera* review of emails); *Lorei v. Smith*, 464 So. 2d 1330 (Fla. Dist. Ct. App. 1985) ("The exclusive technique adopted by the legislature for the accomplishment of the [Public Records] Act's purposes is judicial intervention.").[7]

Bear argues, however, that his counsel should also be able to review the documents.[8]  He argues the documents may be responsive to discovery and the Court has discretion to allow counsel to review the documents.  The Court, however, is unable to find any support for Bear's position.  To the contrary, in *O'Boyle*, the court stated, "When judicial intervention is requested to test the adequacy of the entity's

---

[7] *See Walton v. Dugger*, 634 So. 2d 1059 (Fla. 1993) ("When, as in the instant case, certain statutory exemptions are claimed by the party against whom the public records request has been filed or when doubt exists as to whether a particular document must be disclosed, the proper procedure is to furnish the document to the trial judge for an *in camera* inspection.")*.*

[8] Although Bear argued in his reply that the Court could not "fairly adjudicate" whether the documents withheld were public records without providing his counsel access to the documents, ECF Doc. 87 at 4, Bear concedes in his post-hearing brief that "the Court has discretion to conduct an *in camera* review with or without the assistance of counsel."  ECF doc. 88 at 2.

response, the court can make the requisite determination of relevance and privilege as to any contested record." *O'Boyle*, 257 So. 3d at 1042.  Similarly, in *Lorei*, the state appellate court rejected the appellant's argument that he be allowed through discovery to test the basis of the department's claimed exemptions.  *Lorei*, 464 So. 2d at 1332 ("This court . . . is aware of the 'difficulty which one who seeks such information may have in proving the negative . . .' . . . .  "The answer to that dilemma, however, is to be left to the conscientious judgment of our trial courts . . . .").

Moreover, given the clearly contentious nature of the dispute at hand and the distrust between the parties, the Court highly doubts, as Bear suggests, that "'close calls' could be better resolved if all parties were permitted the opportunity to provide input."   ECF Doc. 88 at 5.   As to Bear's discovery argument, the Court's determination that a record is or is not a public record has no bearing on whether the production of the record is otherwise required under the rules of discovery.  The Court finds it is fully capable of reviewing the disputed documents and determining whether they constitute public records.

The Court agrees with Bear, however, that it is disconcerting, to say the least, that the only person who reviewed the withheld documents to determine whether they are public records was Underhill.  At the evidentiary hearing, Underhill's lawyers admitted they did not review all the documents; rather, they reviewed only a sample.

Likewise, the ECBCC's lawyers admitted they did not review the documents. The County's in-house staff of attorneys also did not review the documents.

Without such a review, the Court finds it hard to understand how Underhill's counsel could represent "the documents that remain unproduced are not even arguably 'public records,'" or that the pages on the zip drive are not records "intended to perpetuate, communicate, or formalize knowledge of some type" in connection with "official agency business." ECF Doc. 85 at 11; *see Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) (noting that counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched). Without such a review, there was no way for counsel to ensure that the "gold bar" he referenced at the hearing did not also included pieces of pyrite.

As stated above, Underhill has provided to the Court approximately 24,000 pages of documents, consisting of over 8,000 items or individual .pdfs, for *in camera* inspection. The documents consist primarily of Facebook Messenger conversations between Underhill and various Facebook Users, some of whom appear to be friends or social acquaintances. As to those conversations, the documents were produced as single .pdfs based on the Facebook User with whom Underhill was communicating. In other words, if Underhill and User Jane Doe exchanged a handful of messages over a short period of time, then the .pdf may consist of one

page.  If Underhill and User John Doe, however, exchanged numerous messages over the course of a year or more, then the .pdf may consist of hundreds of pages.

According to Underhill, the documents withheld fall into the following categories:   (1) family/personal related; (2) no identifying data in file; (3) political/social posts; (4) marketplace; (5) campaign related; (6) military related; (7) activity file; and (8) memes.  As an initial matter, these categories are of little use to the Court.   First, Underhill only indexed the first 2,700 pages of documents.[9] Second, those descriptions, particularly 1, 3, 5 and 6 are not entirely reflective of the actual content of the document.

Based on the Court's review of *each* of the over 24,000 pages, the Court finds they do include public records.  Specifically, the Court finds Facebook Messenger conversations containing the following content constitute a public record:

(1)     Requests by constituents for Commissioner Underhill to take action or requests from Commissioner Underhill for a constituent to act—this includes, for example, a request from a resident for Commissioner Underhill to look into a matter affecting the District or for Commissioner Underhill to consider voting a certain way on a County matter, as well as requests from Commissioner Underhill for residents to come out in support of a County issue and messages from Commissioner Underhill identifying ways a Facebook User can communicate with;

---

[9] At the pre-hearing status conference held by the Court, the Court asked Underhill to provide a rough index of the documents withheld, as such an index might be helpful in narrowing the parties' dispute.  Indeed, according to Plaintiff, when the parties met in March regarding the protocol for production, the parties agreed an index would be produced, but it was not.  Likewise, instead of producing an index of all documents withheld, as requested by the Court, Underhill stopped at 2,700 pages.  According to Underhill, he stopped indexing after that point because he was coming across the same categories and had already spent 100 hours categorizing those documents.

(2)     General expressions of thanks by residents for Commissioner Underhill's service to the County—this includes, for example a constituent's appreciation for the manner in which Commissioner Underhill responded to an issue;

(3)     Requests for information about County matters from constituents and Commissioner Underhill's response—this includes, for example, a request from a constituent regarding whether District 2 covers certain areas and a request from a business owner on his obligations under the COVID restrictions;

(4)     Expressions of disagreement or complaints by constituents of Commissioner Underhill's position on County matters—this includes, for example, a constituent's discontent due to being blocked from Underhill's Facebook pages after expressing her disagreement with him on a County matter and a constituent's discontent over something Commissioner Underhill said in an ECBCC meeting; and

(5)     Commissioner Underhill's positions and opinions, including his disagreement with constituents, on matters involving the County or to be decided by the County—this includes, for example, Commissioner Underhill's explanation to a constituent about why he voted a certain way on a County matter, what he thinks the ECBCC or its commissioners should do on certain County matters, and actions he plans to take in his role as Commissioner.

Thus, while Defendants seek to recast the .pdfs as containing rogue commentary unrelated to "official agency business," a commissioner cannot use his position as both a shield and a sword. Commissioner Underhill cannot use Facebook to communicate with the public as a commissioner, with the authority and force of that public position, and then seek to prevent such information from being disclosed as a public record under the guise that the ECBCC did not specifically authorize him to make the post or engage in the discussion. "The mandate to provide access to public records takes precedence over disclosure of information that 'may cause inconvenience or embarrassment to public officials.'" *Mechling v. City of Monroe*,

222 P.3d 808, 821 (Wash Ct. App. 2009).   Whether the ECBCC approved or sanctioned Underhill's use of social media does not remove the material from the ambit of a public record.  If it did, any commissioner could conduct County business on social media without fear of violating the Public Records Act.

In *Times Publishing Co.,* the Second District Court of Appeal recognized "[o]ur rapidly expanding digital world . . . has made accessible some types of information that blur the line between public and private information." *Times Publ'g Co.*, 830 So. 2d at 848.  This is particularly true here because Commissioner Underhill combined communications about County business with personal communications, erecting few, if any, boundaries, between his personal life and his role and duties as a commissioner.  Thus, while some communications with family members or friends are purely personal, some are not and clearly arise out of Underhill's role as a commissioner.

However, the fact that a single .pdf may include both purely personal matters and a discussion about matters relating to the County does not take the entire .pdf out of the ambit of Chapter 119's disclosure requirements.  Likewise, it would be unreasonable to construe an entire .pdf, which may consist of years of conversations between Underhill and the Facebook User, as a "public record" just because one or more conversations within that .pdf are subject to disclosure.  Because many of the .pdfs consist of multiple conversations over a period of time, they cannot be as easily

segregated into neat piles of private versus public matters, such as the case with text messages or emails.

For example, a .pdf which consists of 60 pages and includes conversations that took place in 2013 before Underhill was elected commissioner *and also* conversations in 2018 asking for Underhill to take action as a commissioner, is a .pdf that consists of conversations that constitute a public record and conversations that clearly do not qualify as a public record.  In that example, the motion would be granted as to those conversations occurring in 2018 but denied as to those occurring in 2013.  The 2013 messages, thus, would need to be redacted from the .pdf before production.

It is, however, not the Court's obligation to redact purely personal conversations from the .pdfs.  The Court has divided the documents it reviewed into the following three (3) categories:  (1) those .pdfs which do not contain any information qualifying as a public record under Chapter 119; (2) those .pdfs which constitute public records, as defined herein; and (3) those .pdfs which include a mix of public records and non-public records (i.e., purely personal conversations).  The motion to compel is denied as to those .pdfs falling in category number 1 and is granted as to those falling in category 2.  The motion is granted in part, and denied in part as to those .pdfs falling in category 3.  As to category 3, Defendants are directed to redact purely personal conversations.

In making the necessary redactions Defendants are directed that:

1.      Defendants' counsel, that is the ECBCC's counsel (whether in-house or outside counsel) and Underhill's counsel, must be involved in determining what should be redacted;

2.      Each conversation should be considered a record.  A "conversation" is an exchange of messages that occurs on the same day or over the course of consecutive days, which arise out of, or relate to, the same general topic *or* discussion.

3.      Counsel should redact only those "conversations" that are purely personal.  Only entire conversations may be redacted.

4.      Personal messages within a conversation about public matters may not be redacted.  *See Mechling v. City of Monroe*, 222 P.3d 808, 821 (Wash Ct. App. 2009) (reversing lower court's determination that City could redact private information, such as meeting for lunch and birthdays, from emails, which were determined to be a public record, "unless the City can establish a statutory exemption that allows the redaction").  For example, a conversation which contains a message from Underhill telling the Facebook User he is sending out a deputy to respond to the User's complaint about a parking or other violation in District 2, which also includes a message asking the Facebook User how his day is going, is a public record, and the personal message cannot be redacted unless it falls under a statutory exemption.  Any such redactions have the potential of making the conversation incomplete or result in the unredacted message being taken out of context.

5.      Once the redactions are complete, the redacted .pdfs will be submitted to the Court for a second *in camera* review, and the Court will determine if the redacted .pdfs are sufficient to be produced.  If the Court determines the redactions are of information constituting a public record or are not compliant with the instructions set forth herein, the entire .pdf will be produced in unredacted form and the public record part of the .pdf identified.

Accordingly, IT IS ORDERED:

1.      Bear's motion to compel (ECF Doc. 74) is GRANTED, as set forth herein.

2.     The parties are directed to provide the Court with a flash drive by the close of business on **Monday, March 8, 2021**.  The flash drives may be delivered to chambers.  Once three flash drives have been provided, the Court will:

  a.  Provide the Plaintiff with a copy the .pdfs the Court has determined to constitute public records and do not require any redactions.

  b.  Provide the Defendants with a copy of the .pdfs the Court has determined to be in need of review for redactions for purely personal conversations.

  c.  The parties can pick up their respective flash drives from Chambers any time after **12:00 PM on Tuesday, March 9, 2020**.

3.     Defendants shall have until **Tuesday, March 16, 2021** to submit redacted copies of the .pdfs to the Court.  The redacted copies may be provided to the Court in hard copy or electronically.

4.     Chambers will provide the clerk with the documents identified as a public record as well as those that were provided by the parties for *in camera* inspection for the file, but the clerk shall not post the documents on the CM/ECF.

5.     The parties are directed to contact the undersigned's chambers with a mutually agreeable date and time for a telephonic status conference regarding the Plaintiff's request for attorneys' fees.

DONE AND ORDERED this 5th day of March, 2021.

_s/ Hope Thai Cannon_

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**