UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DAVID BEAR,

     Plaintiff,

v.                                                                    Case No. 3:19cv4424-MCR-HTC

ESCAMBIA COUNTY BOARD OF
COUNTY COMMISSIONERS and
DOUGLAS B. UNDERHILL,

     Defendants.

_____/

<u>ORDER ON MOTIONS TO COMPEL</u>

     This matter is before the Court on two motions to compel filed by Plaintiff David Bear against the Defendants.  Both motions seek to compel essentially the same information, but one motion is directed to Defendants Escambia County Board of County Commissioners ("ECBCC") and Commissioner Douglas B. Underhill in his official capacity (ECF Doc. 103), while the other is directed to Defendant Underhill in his individual capacity (ECF Doc. 104).  The information sought in the motions are certain logs, settings, and lists related to Underhill's Facebook account, as well as all Facebook posts.[1]

_____

[1] Specifically, Plaintiff seeks (1) activity logs, including any change in security settings; (2) all Facebook posts, including sharing options when posted and any changes to audience selection and any efforts taken to manually hide comments on Facebook posts; (3) any audience custom lists (to

Upon consideration, and for the reasons set forth below, the motion against ECBCC is DENIED, while the motion against Underhill is GRANTED IN PART. Specifically, the motion is granted to the extent that Underhill is required to produce all information requested, other than "all Facebook posts." As to that request, Underhill is required to produce PDF images of the Facebook posts that bear on the following: (1) who Underhill blocked; (2) what posts were blocked; (3) why Plaintiff was blocked; and (4) what posts relate to Underhill's official business as a commissioner.

## I.   RELEVANCE

If a party fails to answer a request for production, the party seeking the discovery may move for an order compelling a response under Federal Rule of Civil Procedure 37(a)(2). Motions to compel are committed to the sound discretion of the court. *Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 731 (11th Cir.1984).

The threshold question for any discovery request is whether the discovery is relevant. Under Federal Rule of Civil Procedure 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). The

---

both include and exclude); (4) page moderator settings; (5) moderated list (including words, phrases or emojis); (6) all versions of those lists; (7) a log of changes/updates; (8) any demographic restrictions; (9) profanity filter settings; and (10) any user restricted lists and when/where they were applied. ECF Doc. 104 at 15.

proponent of a motion to compel discovery bears the initial burden of proving the information sought is relevant.  *See Moore v. Lender Processing Servs. Inc.*, 2013 WL 2447948, at *2 (M.D. Fla. June 5, 2013).  Relevance for discovery purposes is much broader than relevance for trial purposes.  *See Davis on behalf of J.D.D. v. Carroll*, 2018 WL 8370049, at *1 (M.D. Fla. Mar. 7, 2018).

Plaintiff's claims against Defendants are two-fold.  First, in counts I–IV, Plaintiff contends Defendants violated the Florida Public Records Act, Chapter 119, *et seq.*, and in counts V–VII, Plaintiff alleges Defendants violated his First Amendment rights by blocking or allowing Defendant Underhill to censor and block Plaintiff from his Facebook account.  ECF Doc. 15 (amended complaint).  Plaintiff argues the information sought in the instant motions to compel is relevant to the First Amendment claim because it will show how Underhill uses his Facebook account, who he blocked on his Facebook account, and why he blocked them.

As Plaintiff points out, Defendants ECBCC and Underhill, in his official capacity, do not dispute the relevancy of the information; instead, these Defendants argue they are not in "possession, custody, or control" of Underhill's Facebook account because it is a personal account.  The Court will deal with this argument in Section III, below.  While Underhill, in his individual capacity, also does not argue lack of relevance in his written opposition, he does raise relevancy as an objection

in his written discovery responses.  As an initial matter, the Court agrees with Plaintiff—the information sought is relevant.

As Underhill acknowledges, "the essence of [Count VII] is that Mr. Underhill was a state actor taking state action to deprive the Plaintiff of his Constitutional right of free speech.  That count frames the factual issues on which any discovery could be had." ECF Doc. 107 at 4.  To succeed on this First Amendment claim, Plaintiff will need to present evidence to establish the following: (1) Underhill was acting under color of state law when he blocked Plaintiff from his Facebook account; (2) the Facebook account was a public form; and (3) Underhill's restriction of Plaintiff's access to that account was unconstitutional.  *See Attwood v. Clemons*, 1:18-cv-38-MW/MJF, 2021 WL 1020449 (N.D. Fla. March 17, 2021) (analyzing the elements of a First Amendment claim with regard to a state legislature's Facebook account).

Whether Underhill was acting under "color of state law" depends on whether there is a "close nexus between the State and the challenged action." *See id.* at *4. The following factors "convey state action within the social media contest": "(1) whether the official uses the account in furtherance of their official duties, and (2) whether the presentation of the account is connected with the official's position." *Id.* at *6.  "[W]here the sole intention of a public official is to suppress speech critical of his conduct or official duties or fitness for public office, his actions are more fairly attributable to the state." *Windom v. Harshbarger*, 396 F.Supp. 3d 675, 685 (N.D.

W. Va. 2019).  *Some* of Underhill's Facebook posts, thus, are relevant to this inquiry.

*Id.* (analyzing the content of the Facebook posts to determine whether defendant's

social media accounts met the state action requirement).

To determine whether the account was a public forum, the Court "will be

informed by how the official describes and uses the account; to whom features of

the account are made available; and how others, including government officials and

agencies, regard and treat the account."  *Knight First Amendment Inst. at Columbia*

*University v. Trump,* 928 F.3d 226, 236 (2d Cir. 2019), *cert granted, judgment*

*vacated sub nom. Biden v. Knight First Amendment Inst. at Columbia University*,

141 S. Ct. 1220 (2021).  The Court should look to whether the account had any

privacy restrictions or explicit content restrictions.  *See Attwood*, 2021 WL 1020449,

at *10 (looking at "account settings" to determine whether legislature's personal

social media accounts are "public forums").

The information Plaintiff seeks to compel is relevant to that inquiry.  Namely,

moderator settings (settings on Facebook designating a moderator who, like an

administrator, can review posts, delete posts, and manage memberships), security

settings, sharing options, audience custom lists (settings on Facebook that allow the

user to target specific Facebook audiences), demographic restrictions, and restricted

user lists contain information regarding to whom the features of Underhill's account

were made available, the audience Underhill targeted, as well as who Underhill

allowed to review or delete posts.  As the *Knight* Court stated, "Whether First Amendment concerns are triggered when a public official uses his account in ways that differ from those presented on this appeal will in most instances be a fact–specific inquiry."  *Knight*, 928 F.3d at 236.

Likewise, the information sought is relevant to the Court's inquiry regarding whether any restrictions placed by Underhill on his account were permissible. "[C]ontent restrictions in a designated public forum are subject to strict scrutiny." *Attwood*, 2021 WL 1020449, at *11.  Content based restriction is a restriction based on the "topic discussed or the idea or message expressed."  *Id.*  A specifically "egregious form of content restriction" is viewpoint-based restriction, which "targets particular views taken by the speaker rather than the topic."  *Id.* ("Viewpoint-based restriction is an egregious form of content restriction because the rationale of the restriction is based on suppressing the speaker's ideology, opinion, or perspective.").

Plaintiff's requests for hidden comments, profanity filter settings, and what Plaintiff calls "moderated list" seek information regarding whether Underhill blocks content of posts based on certain words, phrases, emojis, profanity, or a Facebook user's demographic.  For example, by utilizing page moderation settings or profanity filters, a Facebook account administrator can automatically hide posts from a Facebook page if it contains certain words.  Thus, this information is relevant to the

Court's determination of whether Underhill blocked Plaintiff's posts or messages based on their content or because Plaintiff's viewpoint was different from his, as alleged.  *See id.* at n.5 ("Based on Supreme Court precedent, restricting speech in a designated public forum based solely on a propensity for profanity is arguably unconstitutional." (internal citations omitted)).

Having made the threshold determination that the information is relevant, the Court will now address Defendants' other arguments.

## II.   ARGUMENTS RAISED BY UNDERHILL IN HIS INDIVIDUAL CAPACITY

Underhill argues the record is already fully developed and sufficient for the Court to determine whether Plaintiff has proven his First Amendment claim because Defendants submitted *all* Facebook posts to the Court for *in camera* inspection for the prior motion to compel.  Underhill also argues the information sought is duplicative of the Facebook posts already produced and that the additional information sought is not "readily accessible" and would require an expert.  Finally, Underhill argues the issue is moot because he has, since the undersigned issued her order on the prior motion to compel, terminated his Commissioner Doug Underhill Facebook page, leaving only his Douglas Underhill page.  The Court finds no merit in these arguments.

## A.    The Prior Motion to Compel

Underhill mixes apples with oranges.  The prior motion to compel dealt with one issue—that is, whether the Facebook posts withheld by Defendants in response to Plaintiff's request under the Florida Public Records Act constitute "public records" under Florida Statutes, Chapter 119.  While, certainly, some Facebook posts, which the undersigned determined to constitute public records, may also be relevant to Plaintiff's First Amendment claim, the sole lens under which the Court analyzed the posts was to determine whether it was a public record.  Indeed, Defendants argued in their response to that motion to compel that whether a post is responsive on one issue is not determinative of its relevance to the other.  ECF Doc. 84 at 16 ("While Plaintiff's public records request may encompass posts that could be relevant to the allegations in the FAC of violation of Plaintiff's First amendment rights that does not make those posts 'public records' within the meaning of the Florida Public Records Act.").  Yet, Defendants take the opposite position here.

Moreover, the Facebook posts are only one piece of the puzzle.  As stated above, while the content of the post is one piece of the puzzle in determining how Underhill used his account and whether his conduct qualifies as state action, the Facebook posts do not tell the entire story.  The Facebook posts do not, for example, reveal what criteria Underhill utilized in blocking posts or access to his Facebook pages, which would be available in the page moderator settings.  Also, the Facebook

posts are neither duplicative nor cumulative of the information sought by Plaintiff in the present motion to compel.  Defendants' own expert, Clark Partington attorney Mary Grace Rahm, testified at the prior hearing that the downloaded posts did not include any hidden comments.

Regardless, Underhill's argument misses the boat because Underhill cannot abdicate his discovery obligations by having the Court conduct an *in camera* inspection of Underhill's Facebook posts.  Instead, it is Underhill's obligation to review *each* post and determine whether it is relevant to the discovery requests.  It is not the Court's obligation, nor the Plaintiff's, to cull through the posts and identify those posts relevant to Plaintiff's First Amendment claim or Defendants' defenses.

Equally unavailing is Underhill's argument that no additional discovery is needed because it is undisputed his Facebook account is not government sponsored or, indeed, even government sanctioned.[2]  While Underhill is correct that those facts are not in dispute, they are also not determinative.  *See, e.g.*, *Windom*, 396 F. Supp.

---

[2] Underhill also argues it is undisputed that Facebook is not a government entity, and it has ultimate authority as to what can be posted.  That argument has been repeatedly rejected as determinative of whether a social media site is a "public forum."  *See Davison v. Randall,* 912 F.3d 666, 680 (4th Cir. 2019) (holding that a public official who used a Facebook Page as a tool of her office exercised state action when banning a constituent); *Attwood*, 2021 WL 1020449, at * 11.  Also, while recognizing that Twitter's ability to shut down then-President Trump's Twitter account certainly casts a shadow on the Second Circuit's determination that the account was a public forum and hinting that it might be prudent for the legislature to consider some regulation of these private digital platforms' ability to censor speech, Justice Thomas recognized that those issues are for another day. *See Biden*, 141 S. Ct. at 1227.

3d at 679 n.1 (denying motion to dismiss First Amendment claim even though the "Facebook page at issue was neither established by the West Virginia House of Delegates nor, based on the record before the Court, operated by any employee of the House").

That said, the Court finds Plaintiff's request for "all Facebook posts" to be overly broad and not proportional to the needs of this case. The Court finds that only those Facebook posts containing information showing that Underhill blocked a Facebook user or blocked Plaintiff, showing why Underhill may have blocked a user or Plaintiff, referencing Plaintiff, or containing content related to county business to be relevant.[3]   The Court also finds that the Facebook posts should be produced in PDF format, rather than native form, as that is what the parties agreed to in their Rule 26 report. *See* ECF Doc. 41 at 7.

### B.     The Information is Not "Readily Accessible"

Underhill also argues the information sought is not "readily accessible" and will require an expert to extract the information, which the Board has already paid for once with regard to Plaintiff's Public Records Act request.

---

[3] Pursuant to the undersigned's order on the prior motion to compel, Plaintiff is already in possession of those posts that the undersigned determined to contain information relating to county business.  Thus, even if the District Judge sustains Defendants' objections to the undersigned's order, those posts would still be discoverable as to Plaintiff's First Amendment claim.

Under Federal Rule of Civil Procedure 26(b)(2)(B), "[a] party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B). The responding party has the burden to make this showing. *U & I Corporation v. Advanced Medical Design, Inc.*, 251 F.R.D. 667, 674 (M.D. Fla. 2008). In meeting this burden, the responding party should present details sufficient to allow the requesting party to evaluate the costs and benefits of searching and producing the identified sources. *Quail Cruises Ship Mgmt. Ltd. v. Agencia De Viagens CVC Tur Limitada*, 2012 WL 12949753, at *2 (S.D. Fla. Feb. 14, 2012) (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978)).

Underhill has submitted an affidavit stating he is "is not aware of any documents that show 'privacy or security' settings, 'activity logs,' 'change logs,' and, to the degree they might exist, they would have been produced as part of the more than 36,000 pages of Facebook downloads before the Court." As stated above, a production to the Court does not equate to a production to Plaintiff. Regardless, that statement, alone, is insufficient to meet Underhill's burden of showing that the information sought is not readily accessible. ESI does not have to be an existing document to be "readily accessible." *See Quail*, 2012 WL 12949753, at *2 ("Generally, ESI located on 'active, online data' (hard drive) or 'near-line data' (optical disks or magnetic tape) are considered 'accessible.'").

Even if Underhill is able to meet his burden of showing the requested ESI is not reasonably accessible, "the court may nonetheless order discovery . . . if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery." Fed. R. Civ. P. 26(b)(2)(B). In determining whether good cause has been shown, the Court must consider "whether the burden or expense of the proposed discovery outweighs the likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake . . . and the importance of the proposed discovery in resolving the issues." *Wynmoor Cmty. Council, Inc. v. QBE Ins. Corp.*, 280 F.R.D. 681, 685 (S.D. Fla. 2012).

The Court finds good cause exists in this case. As stated above, the information bears directly on the issues in this case, and the information is not duplicative or cumulative. The information sought is exactly the type of information that other courts addressing this issue have considered as necessary. As the *Windom* court stated, "[D]iscovery will provide useful insight as to how, if, when, and why [Defendant] used his page and possibly prevented others from doing so." *Windom*, 396 F. Supp. 3d at 685. Similarly, in *Attwood,* Chief Judge Walker noted that "the totality of the circumstances [] determine whether the private account has transformed into an organ of official business. If it has, the state action requirement is met." *Attwood*, 2021 WL 1020449, at *6. Indeed, in denying Defendants' motion

to dismiss, this Court noted, "Because the [First Amendment] claims are plausible, they must be resolved based on a fully developed record."  ECF Doc. 67 at 3.

The Court also finds that the issue of cost can be easily addressed, as the parties' planning meeting specifically states that "in the event the court orders the production of data beyond what is reasonably available to the parties in the ordinary course of business, the requesting party shall bear the cost of its disclosure or production."  ECF Doc. 41 at 6.  Thus, *if* Underhill can establish the information sought is not readily accessible, then he can seek to shift the burden of hiring an expert or other cost of retrieving the data to the Plaintiff.  The Court expects that the information sought can be extracted by means other than making Plaintiff a "friend" on Underhill's Facebook account, as Underhill appears to suggest.[4]

Finally, the Court agrees with Plaintiff that the issue is not mooted by Underhill's voluntary termination of the "Commissioner Underhill" Facebook page. "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)); *see also United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203

---

[4] Plaintiff argues in the reply that the information can be provided through a Facebook download or by allowing Facebook to release the information.

(1968) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case[.]").  "Otherwise, a party could moot a challenge to a practice simply by changing the practice during the course of a lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." *Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998).

"[T]he voluntary cessation of challenged conduct will only moot a claim when there is no 'reasonable expectation' that the accused litigant will resume the conduct after the lawsuit is dismissed." *Bankshot Billards, Inc. v. City of Ocala*, 634 F.3d 1340, 1351 (11th Cir. 2011) (citing *Jews for Jesus*, 162 F.3d at 629).  "Generally, the 'party asserting mootness' bears the 'heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again.'" *Id.* (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189).  Clearly, Underhill can resurrect that Facebook page at any time.  Moreover, neither the information sought, nor Plaintiff's First Amendment claim, is limited to the Commissioner Underhill Facebook page. The issue of whether the Underhill Facebook page is a public forum is still in play in this case.

Thus, the Court will grant the motion to compel as to Underhill as to all information requested with the exception that Underhill will not be required to produce "all Facebook posts."  Instead, Underhill is required to produce only those posts that bear on the following:  (1) who Underhill blocked; (2) what posts were

blocked; (3) why Plaintiff was blocked; and (4) what posts relate to Underhill's official business as a commissioner.

## III.    "POSSESSION, CUSTODY, AND CONTROL"

As stated above, Defendants ECBCC and Underhill, in his official capacity, make one argument—that they do not have "control" of Underhill's personal Facebook account and thus cannot produce the information sought.    Plaintiff counters by arguing Defendants have control, at least, over "those records that were created or received pursuant to Underhill's official duties."    Plaintiff argues that Underhill's position—that he, in his official capacity, does not have control over himself in his individual capacity—is a "legal fiction."

Federal Rule of Civil Procedure 34(a) requires a party to produce relevant documents and other physical items that are in the possession, custody, or control of the party upon whom the request is served.    *See* Fed. R. Civ. P. 34(a).    The burden of establishing control over the documents sought is on the party seeking production. *See State Farm Mutual Automobile Ins. Co. v. Precious Physical Therapy*, 2020 WL 7056039, at *5 (E. D. Mich. Dec. 2, 2020).

Courts have universally held that documents are deemed to be within the possession, custody, or control if the party has actual possession, custody, or control, or has the legal right to obtain the documents on demand.    *See Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1983) ("Control is defined not only as possession, but

as the legal right to obtain documents upon demand."); *Rivera v. Amalgamated Debt Collection Servs., Inc.*, 2006 WL 8433127, at *1 (S.D. Fla. Apr. 4, 2006) (citing cases from several jurisdiction defining control).

Several courts in this circuit, including in this district, have broadly defined the concept of control to include the practical ability to obtain documents. *See, e.g.*, *In re Sergeeva*, No. 113CV03437SCJRGV, 2013 WL 12169388, at *8 (N.D. Ga. Nov. 22, 2013), *objections overruled*, No. 1:13-CV-3437-LMM-RGV, 2015 WL 12866970 (N.D. Ga. Feb. 6, 2015) ("Instead, 'control' has been 'construed broadly by the courts' to include not just a legal right, but also a 'practical ability to obtain the materials' on demand."); *Costa v. Kerzner Int'l Resorts, Inc.*, 277 F.R.D. 468, 471 (S.D. Fla. 2011) ("Control, therefore, does not require that a party have legal ownership or actual physical possession of the documents at issue; indeed, documents have been considered to be under a party's control (for discovery purposes) when that party has the 'right, authority, or practical ability to obtain the materials sought on demand.'").

The practical ability to obtain information from another does not simply mean having access to the information. *See In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 431 (M.D. Fla. 2018). Instead, "inherent in the 'practical ability' test is some legal right of control over the information possessed," through some legal or contract relationship, such as the existence of an employer-employee relationship.

*Id.* While a commissioner is not an "employee" of the ECBCC, at least two courts have held that such a legal relationship exists between a commissioner and the governing board in which the commissioner is a member. However, as discussed below, those courts have not gone so far as to extend that "control" to all information that may be in the commissioner's possession.

In *Conlin v. City of Des Moines, Iowa*, 2014 WL 11514496 (S.D. Iowa Sep. 4, 2014), cited by Plaintiff, the court determined the City has the practical ability and authority to obtain documents "generated by, provided to, or are in the possession of City Council Members or Historic Preservation Commissioners because of their official duties for the City." *Conlin*, 2014 WL 11514496, at *2. While that case supports the position that a "legal relationship" exists even though there is no employee/employer relationship, that case is of limited value because the court does not explain the basis on which it reached this conclusion. *Id*. Moreover, there is no discussion about the type of documents that were sought and, certainly, nothing indicating the documents at issue were social media posts or settings.

Another case that comes closer, but still misses the mark, is *Robert Wigington v. Metropolitan Nashville Airport Authority*, 2019 WL 12096809 (M.D. Tenn. May 31, 2019). In that case, the plaintiff alleged the MNAA wrongfully terminated him. Plaintiff moved to compel the MNAA to "search for and produce all emails and text messages to or from members of the MNAA Board of Commissioners" related to

the suit. *Robert Wigington*, 2019 WL 12096809, at *5. The MNAA objected on the grounds that it did not have "control" of any communications made on the Commissioners' personal devices and that it does not provide the Commissioners with any official devices. *Id.* The court disagreed and ordered MNAA to "search all text and email communications discussing MNAA affairs made or received by each commissioner on a personal electronic device or otherwise, and to produce those communications responsive to [plaintiff]'s discovery requests. *Id.*

In explaining its decision, the court determined the MNAA has "actual possession of its commissioners' communications about MNAA business because MNAA does not exist separately from its commissioners," "[t]he Board of Commissioners is MNAA's governing body," and thus "the commissioners *are* MNAA,"[5] and "[a]ny official communication possessed by a commissioner is necessarily also in MNAA's possession, custody, or control." *Id.* at *4. The court further concluded MNAA had a legal right to the communications under Tennessee's Public Records Act. Additionally, the court clarified that it was not suggesting the MNAA had an obligation to produce cell phones or other electronic devices belonging to the city officials. *Id.* at *5.

---

[5] Like the MNAA, the ECBCC does not exist independent of its commissioners. Also, like the MNAA commissioners, the ECBCC commissioners are ECBCC's governing body. *See* Fla. Stat. Ch. 125.

While *Wigington* certainly supports the undersigned's prior determination that Underhill's Facebook posts may be "public records" regardless of whether the ECBCC (as Defendants' suggest) authorized the making of the post, it is not as helpful on this motion to compel for several reasons.  First, the lists, restrictions, logs, and settings that Plaintiff seeks do not constitute communications made or sent by Underhill as a commissioner.  Second, the issue of whether Plaintiff is entitled to certain Facebook posts under the Florida Public Records Act has already been addressed.  Third, while the *Wigington* court placed the burden on the MNAA for producing communications under the Tennessee Public Records Act that may be in the possession of the commissioners, there is authority in Florida suggesting that the burden falls on the commissioner.  *See Op. Att'y Gen. Fla. 2008-07* (Feb. 26, 2008); *See* Fla. Stat. 119.07(1)(a) ("Every person who has custody of a public record shall permit the record to be inspected and copied . . . .").

Indeed, it appears that when it comes to social media or personal devices, courts have held, *albeit* in the employer/employee context, that the employer should ask for the information, but have not gone so far as to hold that such information is in the employer's control, even when the device is used for the employer's business. *See, e.g.*, *ID Ventures, LLC v. Chubb Custom Ins. Co.*, 2018 WL 8807125, at * 2 (E.D. Mich. Oct. 12, 2018); *Union Home Mortg. Corp. v. Jenkins*, 2021 WL

1110440, at *9–10 (N.D. Ohio Mar. 23, 2021).  *But see State Farm Mut. Auto. Ins. Co.*, 2020 WL 7056039, at *5–7.

Given the lack of clear authority on this issue, the Court finds it unnecessary to compel the ECBCC to produce the information when the information is available from Underhill.  *See In re Disposable Contact Lens Antitrust*, 329 F.R.D. at 431 ("It is also critical to note that courts routinely 'decline[] to compel production of documents in the hands of one party when the material is equally available to the other party from another source.'").  Thus, the Court will deny the motion as it pertains to the ECBCC.

Finally, to the extent Underhill, in his official capacity, is arguing he does not have "possession, custody, or control" of the Facebook account, that argument is nonsensical.[6]  As Defendants recognize, whether a party is sued in his or her "official" versus "individual" capacity relates to a "legal concept of governmental liability" and not "physical control."  *See Attwood v. Clemons*, 818 F. App'x 863, 871 (11th Cir. 2020) (Grant, J., concurring in part) (noting that "in an official capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself," while "individual capacity

---

[6] Although the response is filed on behalf of ECBCC and Underhill, in his official capacity, the body of the argument is only that the ECBCC does not have control over Underhill's personal Facebook account.  Indeed, at the end of the response, Defendants state that the Plaintiff's motion should be denied and fees and costs awarded to ECBCC.

suits seek to impose personal liability upon a government official for actions he takes under color of state law"); *Attwood*, 2021 WL 1020449, at * 3 (noting that "[a]n official capacity claim may proceed only if 'the real party in interest is the governmental entity, not the named official," while "an individual capacity claim is one where 'the real party in interest is the individual not the sovereign'"). Thus, while the capacity in which Underhill has been sued may be determinative of the relief available, it is irrelevant to whether Underhill has "possession, custody, or control" of the Underhill Facebook account. Regardless of the capacity sued, Underhill clearly does.

Accordingly, it is ORDERED:

1.    Plaintiff's motion to compel against the ECBCC (ECF Doc. 103) is DENIED.

2.    Plaintiff's motion to compel against Underhill (ECF Doc. 104) is GRANTED IN PART, as set forth herein.

3.    Underhill must provide responsive documents within fourteen (14) days of the date of this Order.

DONE AND ORDERED this 17th day of May, 2021.

*s/ Hope Thai Cannon*
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**