Escambia County
Clerk's Original

1/6/2022 CATI-8

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (the "Agreement") is entered into by and among **DAVID BEAR** and **THE ESCAMBIA COUNTY BOARD OF COUNTY COMMISSIONERS** (the "County") upon the effective date of 7. January, 2022.

WHEREAS, on or around October 4, 2019, David Bear filed a lawsuit against the County and Commissioner Douglas Underhill alleging violations of his right to public records under Chapter 119, Florida Statutes, and his First Amendment rights, in the Circuit Court in and for Escambia County, Florida, Case No. 2019 CA 001636.

WHEREAS, on or around November 6, 2019, the County removed the lawsuit to federal court where it remains pending as Case No. 3:19-cv-04424-MCR-EMT.

WHEREAS, on or around December 10, 2019, Mr. Bear filed a second lawsuit against the County and Commissioner Underhill alleging violations of his right to public records under Chapter 119, Florida Statutes, in the Circuit Court in and for Escambia County, Florida, Case No. 2019 CA 002004 (these lawsuits are referred to collectively herein as the "Lawsuits").

WHEREAS, this Agreement solely relates to the County's liability resulting from its actions, taken as a collegial body, as alleged in the Lawsuits, as opposed to the liability of Commissioner Underhill resulting from his alleged actions taken in his individual capacity and/or official capacity. Mr. Bear waives his claims against the County related to the County's actions taken as a collegial body, as alleged in the Lawsuits, but does not waive any claims against Commissioner Underhill, regardless of whether his actions were taken in his individual capacity and/or official capacity, and regardless of whether Mr. Bear's claims implicate the County's liability.

WHEREAS, this Agreement in no way releases, excuses, or otherwise relates to Commissioner Underhill's liability in the Lawsuits. The Lawsuits will continue against Commissioner Underhill in his individual capacity and official capacity.

NOW, THEREFORE, in exchange for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Recitals**. The above recitals are true and correct and incorporated herein by reference.

2. **Stipulation.** In consideration for resolution of the Lawsuits, as to the County's involvement, the County agrees to endorse and execute the stipulation, attached as Exhibit "A" hereto (the "Stipulation").

3. **Dismissal.** Within ten (10) days of receipt of the executed Stipulation, Mr. Bear and the County will jointly dismiss the County from the Lawsuits, with the Court reserving jurisdiction to enforce this Agreement.

1

4. **Conditional Release of Attorneys' Fees.** Mr. Bear agrees to a conditional release of his right to seek attorneys' fees and costs from the County subject to the following condition: In the event the County pays or reimburses any portion of Commissioner Underhill's attorneys' fees or costs related to either of the Lawsuits, regardless of whether such payment or reimbursement is voluntary or compelled by judgment or court order, the County agrees to pay the liquidated sum of $190,000 to Mr. Bear for his attorneys' fees and costs within 30 days of any payment or reimbursement to Commissioner Underhill. The parties recognize that the County will abide by any court order and that the purpose of this provision is to incent the County to vigorously defend any claim asserted by Commissioner Underhill seeking reimbursement of any of his attorneys' fees or costs.

5. **Mutual Release.** Except as provided in paragraph 4 above, upon execution of the Stipulation, Mr. Bear and the County, on behalf of themselves and their successors, assigns, agents, principals, employees, attorneys, and representatives, hereby release, remise, acquit, satisfy, and discharge one another, and attorneys, of, for and from all known and unknown actions, causes of action, theories of recovery, liability, fault, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands, including any claims or demands for personal injury in law or in equity, that it may have against one another related to the Lawsuits up until the signing of this Agreement. This release does not apply to any actions, causes of action, theories of recovery, liability, fault, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands, including any claims or demands for personal injury in law or in equity, Mr. Bear has, or may have, against Commissioner Underhill, in his individual and/or official capacities.

6. **Severability**. Should any provision of this Agreement be held invalid or illegal, such illegality or invalidity shall not invalidate the whole of this Agreement. The Agreement shall be construed as if it did not contain the illegal part, and the rights and obligations of the parties shall be construed and enforced accordingly.

7. **Modifications**. It is expressly understood and agreed that this Agreement may not be altered, amended, modified, or otherwise changed in any respect whatsoever, except by writing duly executed by an authorized representative of Mr. Bear and the County.

8. **Counterparts**. This Agreement may be signed in counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument. A facsimile or copy of a signature is valid as an original.

9. **Successors and Assigns**. Mr. Bear and the County agree and represent that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim against each other or a portion thereof or interest therein. This Agreement, and the respective representations, warranties, covenants, provisions, terms, conditions, and agreements contained in this Agreement, shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, beneficiaries, assigns, and heirs.

2

10.   **Governing Law**. This Agreement shall be governed exclusively by its terms and the laws of the State of Florida. In the event that any Party incurs any expenses by reason of any breach of this Agreement, whether suit be brought or not, said Party shall be entitled to recover from the other Party any and all sums so paid, including costs and attorneys' fees, together with interest thereon.

IN WITNESS WHEREOF, each of the parties have duly executed this Agreement by their own free will and as of the date herein below written.

| DAVID BEAR | ESCAMBIA COUNTY BOARD OF COUNTY COMMISSIONERS |
|---|---|
| Signature: _____ | Signature: _____ |
| By: David M. Bear | By: Jeff Bergosh |
| Date: 1/7/2022 | Title: Chairman, BCC |
| | Date: 1/6/2022 |

ATTEST: PAM CHILDERS
CLERK OF THE CIRCUIT COURT
BY: _____
DEPUTY CLERK

Approved as to form and legal sufficiency.
By/Title: _____
Date: 1/6/22

3

ATTEST: PAM CHILDERS
CLERK OF THE CIRCUIT COURT

**SEAL**

By
DEPUTY CLERK

Approved as to form and legal
sufficiency.

By Title:
Date:

STATE OF FLORIDA
COUNTY OF ESCAMBIA

     The foregoing instrument was acknowledged before me, by means of ☑ physical presence or ☐ online notarization, this _____ day of January, 2022, by David Bear, who (✓) is personally known to me, or (_) has produced current _____ as identification.

_____
Signature of Notary Public



_____
Printed Name of Notary Public

(Notary Seal)

MARY ELIZABETH HALEY
Commission # HH 133853
Expires May 25, 2025
Bonded Thru Budget Notary Services

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

DAVID BEAR,

      Plaintiff,

                          CASE NUMBER:  3:19-cv-04424-MCR/HTC

v.

ESCAMBIA COUNTY BOARD OF
COUNTY COMMISSIONERS AND
DOUGLAS UNDERHILL,

      Defendants.

---

## STIPULATION OF FACTS

The Escambia County Board of County Commissioners hereby stipulates to the following facts as true as asserted below:

### Timeline of Public Records Requests from Mr. David Bear

1.  On April 30, 2019, County Attorney Alison Rogers received a public records request via telephone from David Bear.  Responsive records were provided to Mr. Bear on April 30, 2019.

2.  Also on April 30, 2019, Mr. Bear requested additional documents via email. Responsive records were provided to Mr. Bear on May 1, 2019.

3.  On May 1, 2019, Mr. Bear further requested public records via email, "…all of Commissioner Underhill's comments made on his social media pages, both

personal and public, regarding the topic of social media used by a commissioner."

4. On May 2, 2019, the May 1, 2019, request from Mr. Bear was forwarded to District 2 Aide Jonathan Owens by Senior Assistant County Attorney Kristin Hual for completion.

5. On May 16, 2019, the Board voted to drop the technology policy. (ECF, ¶14).

6. On August 9, 2019, the County and Commissioner Underhill received a letter from Attorney JJ Talbott regarding a public records request that was  directed to Commissioner Douglas Underhill through his Facebook account.  Said request was made on or around May 9, 2019.

7. On August 9, 2019, Commissioner Underhill replied to Mr. Talbott via email.

8. On August 16, 2019, Commissioner Underhill replied to Mr. Talbott via email with a status report on the request.

9. On August 19, 2019, Commissioner Underhill informed Mr. Talbott via email that a thumb drive was ready to be picked up from the Receptionist's desk on the Fourth Floor of the Ernie Lee Magaha Governmental Complex.  Said thumb drive contained 9 screen shots of direct messages involving Commissioner Underhill.

10.Letters and emails were exchanged between Commissioner Underhill and Mr. Talbott from August 19, 2019, through September 4, 2019, regarding the delivery of the records via thumb drive.

11. The records referenced in paragraphs 7 through 11 were not seen or reviewed by the County Attorney's Office.

12. On August 20, 2019, a public records request was sent via email to both Commissioner Underhill's Office and the County Attorney's Office. Contemporaneously, Mr. Bear also directed a request for the same information to Commissioner Underhill's Facebook account.

13. On August 22, 2019, Commissioner Underhill acknowledged the receipt of this request.

14. On August 27, 2019, Mr. Bear amended his initial request.

15. On September 6, 2019, Mr. Bear requested a status of the social media portion of his May 1, 2019, request via email to Ms. Hual.

16. On September 12, 2019, Ms. Rogers replied to Mr. Bear that she assumed that he was getting with his attorney, J.J. Talbott, to see if the records that were provided by Commissioner Underhill in August satisfied his request. On the same day, Mr. Bear confirmed that the records provided to Mr. Talbott by Commissioner Underhill were not responsive to his request.

17. On September 12, 2019, then-County Attorney's Office Manager Alain Espinosa emailed Jonathan Owens further explaining that the records provided by Commissioner Underhill were not responsive to the May 1, 2019, public record

3

request.

18. On September 12, 2019, Commissioner Underhill emailed Mr. Bear acknowledging receipt of the request and stated that the records request would be completed on Monday, September 16, 2019.

19. On October 18, 2019, David Bear sent an email to Commissioner Underhill's Office, Commissioner Underhill, and the County Attorney's Office with a new public record request for records related to the "Doug Underhill for District 2" Facebook page.

20. On October 18, 2019, Alain Espinosa forwarded the request received by the County Attorney's Office to the District 2 Aide, Jonathan Owens for completion.

21. On October 21, 2019, Commissioner Underhill emailed Alain Espinosa with a status update on the completion of the public records request and indicated that he would provide the records in image format.  Commissioner Underhill also stated that it would take him approximately 15 hours of his time to complete the request, so they should charge Mr. Bear accordingly.

22. On October 23, 2019, Mr. Bear emailed Commissioner Underhill requesting that he proceed with the duplication of records and provide an estimate of costs.

23. On October 25, 2019, the then-Deputy County Attorney Charlie Peppler sent a letter to J.J. Talbott regarding charges for time spent gathering certain social media

4

posts by Commissioner Underhill. Mr. Peppler sent a copy of that letter to the State Attorney's Office. On October 29, 2019, Attorney Talbott responded to Mr. Peppler's letter and asserted that the charges that Commissioner Underhill wanted to require to produce the records were improper and attempted to "chill" Mr. Bear's right under Chapter 119.    Additionally, the County Attorney spoke with the Commissioner's Aide, Johnathan Owens, by phone and advised that due to the long-standing nature of the request and the scrutiny of the State Attorney's Office due to previous complaints made to that office, the requesting party should not be charged for records provided to him and to do so was exacerbating the problem.

24. None of the records referenced above that were provided by Commissioner Underhill in response to Mr. Bear's public records requests were provided to or reviewed by the County Attorney's Office to determine completeness.

25. Ultimately, on or around October 4, 2019, Mr. Bear initiated a lawsuit to compel the County and Commissioner Underhill to produce public records that had been withheld.

26. Additionally, on December 3, 2019, Attorney Talbott sent a letter, addressed to Mr. Peppler, to Commissioner Underhill's office, Commissioner Underhill, and the County stating that it had been over 100 days since Mr. Bear's request was served on both the County and Commissioner Underhill, but no response had been received.

Attorney Talbott informed Commissioner Underhill and the County that if no response was received on or before December 6, 2019, Mr. Bear would be forced to file suit. Thereafter, a second lawsuit was filed.

Board of County Commissioner Technology/Social Media Policies

27. In August of 2009, the Board enacted a policy stating: "Commissioners shall not discuss County business on social networking sites, including but not limited to, Facebook." (ECF 18, ¶ 10) (quoting the County Commissioner's Technology Policy of August 20, 2009). The County Technology Policy's stated purpose was to establish rules for how the County Commissioners use technology to communicate. Not only did the Policy prohibit commissioners from conducting County business on social media but permitted commissioners to post comments regarding County business on accounts of *others* using the commissioner's own name, but it also stated, "Florida Sunshine Law and Public Records Law pose special challenges to the County Commissioners who should follow not just the letter of those laws, but also their intent." . It specifically stated the County would retain a copy of such posting. (ECF 83-4). Underhill never provided the County with a copy of any of his postings regarding County business to be retained.

28. On February 2, 2012, the Board adopted a separate "social media policy" with application primarily to all County employees but, included within its scope, are

6

commissioners and commissioners' aides.   This policy, with respect to the application for a covered employee or commissioner's personal time as a private citizen, prohibits postings purported to be representative of opinions of the County. County policy clearly requires employees and commissioners using social media for personal use clearly state their comments represent their own views and not the views or opinions of the County. (ECF 35-1).

29. On May 16, 2019, the Board voted to drop the technology policy. (ECF, ¶14). County Attorney, Alison Rogers has testified in hearing before Magistrate Judge Cannon, that the Technology Policy and others dictated that the County commissioners were not to conduct County business on social media sites. (Tr. 250, 251).   Notwithstanding County policy prohibiting County commissioners conducting County business on personal social media sites, Commissioner Underhill has stated on more than one occasion he would disregard such prohibitions.

30. Supplemental to the County policy prohibiting commissioners from conducting or appearing to conduct County business on personal social media sites, County Attorney Alison Rogers, on a related but similar concern, has regularly cautioned County commissioners regarding developing areas of the law related to blocking people from communicating or participating in a commissioner's discussions on personal social media pages on matters of public interests. (Tr. 251).

7

The warnings and caution communicated to County commissioners was predicated on evolving case law demonstrating an elected official's personal social media pages, when used to discuss or exchange views on matters of public importance, may be deemed "public forums" implicating the First Amendment Rights under the U.S. Constitution of those participating.   Rogers cautioned commissioners with regard to their social media pages becoming a "public forum" by discussing matters of public interest. (ECF 18, ¶ 25, Ex. A and B) (Tr. 262).

31.Escambia County commissioners do not have County-sponsored or supported media platforms, in part, to preclude unmonitored "public forums" implicating the First Amendment rights of participants.   Underhill communicated with Rogers through emails dated September 10, 2018, through October 16, 2018, copies of which are attached as Exhibit __.

32.The social media accounts of Commissioner Douglas Underhill are under his exclusive control.   Underhill has denied the County access to his social media accounts (Absent his presence and supervision in response to binding discovery obligations in this case).

33.It is undisputed Escambia County does not sponsor or support any platform or Facebook page for commissioners. (Tr. 254).

34.Commissioner Underhill has never been authorized to make Facebook posts

8

on behalf of the County Commission. (Tr. 273).  Notwithstanding County policy, Underhill has regularly, during the period the Technology Policy was in place, conducted County business on his personal social media sites.  Underhill knew or should have known his posts could constitute public records under Chapter 119 requiring him to preserve and produce upon request.  He stated and showed a total disregard for this County Policy. Additionally, Commissioner Underhill's position that his social media posts could not constitute public records under Chapter 119 is contrary to county policy and Florida law governing public records.

35.Even after the Technology Policy was rescinded in May of 2019, Underhill continued to violate County policy by making  posts on his personal social media pages that do not clearly distinguish his personal views from those views as a county commissioner.

36.Underhill's failure to comply with County policy and practice has resulted in the County being joined as a defendant in this pending case.

37.Underhill's conduct on his Commissioner Doug Underhill Facebook page, Doug Underhill for District 2 Facebook page, and his Douglas Underhill Facebook page, along with his activities on other  social media sites,  has created public records within the scope of Chapter 119, Florida Statutes.

38.As such, Underhill had a responsibility to preserve and, upon request, produce

9

those public records as authorized by Chapter 119.

39. Notwithstanding, Underhill declined to produce public records when requested, in this case, by the Plaintiff David Bear, ultimately doing so only pursuant to Court Order.

40. Because of Underhill's personal conduct creating public records through his social media pages and denial of access to others for purposes of producing any such public records, Escambia County has expended, in addition to legal fees to defend itself, at least $10,000.00 providing technological assistance to assist in Underhill's production of public records in compliance with Chapter 119.

41. The involvement of the County as a named Defendant, and the expenditure of County funds to facilitate Underhill's production of public records could have been avoided through Underhill's compliance with County policy and procedures, and Florida law governing public records, as the County understands those obligations.

42. Magistrate Judge Cannon in the Report and Recommendation states "Commissioner Underhill cannot use Facebook to communicate with the public as a commissioner, with the authority and force of that public position, and then seek to prevent such information from being disclosed as a public record under the guise that the Escambia County Board of County Commissioners did not specifically authorize him to make the posts or engage in the discussion." (Doc. 128, p. 15).

10

43. Had Underhill complied with County policy and Florida law governing public records, the unnecessary expenditure of public funds both to defend the action brought against the County and the expense associated with technological assistance for Underhill's production of those public records from his personal social media accounts could have been avoided.

44. The Escambia County Board of County Commissioners believes communication between commissioners and citizens on matters of county business are public records, and releases them, with appropriate redactions, on a regular basis in response to public records requests. Such communications include, but are not limited to text messages, emails and social media posts. Commissioners are trained and advised in this manner. The Board of County Commissioners believes that any social media posts made by Commissioner Underhill that were communications between him and citizens on matters of county business are public records and should have been provided, with appropriate redactions, upon citizen request.

11